John Heenan
Joe Cook
Philip McGrady
HEENAN & COOK, PLLC
1631 Zimmerman Trail, Ste. 1
Billings, MT 59102
Phone: (406) 839-9091
Fax: (406) 839-9092
john@lawmontana.com
joe@lawmontana.com
philip@lawmontana.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| ESTATE OF LUCIO DIMAURO, by and through Personal Representative, NINA DIMAURO; LESLEY JUNGERS, by and through co-Guardians and co-Conservators, LAWRENCE JOCHIM and KARLA LANGLOIS; ESTATE OF DAVID PATZOLDT, by and through Personal Representative, CHRISTINE PAYTON; JOHN DOES 1-X; and JANE DOES 1-X, | Cause No.: CV-23-74-BU-BMM |
| Plaintiffs, | **COMPLAINT AND DEMAND FOR** |
| vs. | **JURY TRIAL** |
| GREG GIANFORTE; CHARLIE BRERETON; DAVID CULBERSON; STATE OF MONTANA; THE DEPARTMENT OF PUBLIC HEALTH AND HUMAN SERVICES; | |

JOHN DOES 1-X; and JANE DOES 1-
X,

                    Defendants.

COME NOW the above-named Plaintiffs, by and through counsel of record, and for their Complaint against the above-named Defendants, states and alleges as follows:

## INTRODUCTION

1.    The Montana State Hospital at Warm Springs has been neglected by the Montana legislature and governors for decades. Due to neglect from the top, the facility itself has run into disrepair, is unsafe for its residents, and is egregiously understaffed, with the not surprising result being that Montanans with: (1) serious mental health problems and (2) lack of financial means are systemically abused and neglected. This case is about Montanans who suffered at Warm Springs because of the neglect of those in power. This is a claim for damages under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the United States Constitution; *Monell* liability under 42 U.S.C. § 1983; violation of Art. II, § 4 of the Montana Constitution; for negligence; for negligence *per se*; and requests injunctive relief. This case is about holding those in power responsible and accountable for the entirely preventable damages to these Plaintiffs, and to force change so these tragedies don't happen to others.

2. The State of Montana owns the Montana State Hospital, and the Department of Public Health and Human Services is an agency of the State of Montana which operates the Montana State Hospital ("MSH") in Warm Springs.

3. The suit names Greg Gianforte, individually and as acting Governor of the State of Montana; Charlie Brereton, individually and as acting Director of the Department of Public Health and Human Services; David Culberson, individually and as the acting administrator of Montana State Hospital; the State of Montana; and the Department of Public Health and Human Services ("DPHHS"). John Does I-X and Jane Does I-X are named for those who are liable for some of the acts, omissions, and other conduct alleged herein.

4. The named Plaintiffs were all civilly committed to the care and custody of the MSH under Title 53 of Mont. Code Ann., which deals with treatment of the seriously mental ill. The purpose of Title 53 is as follows:

> (1) secure for each person who may be suffering from a mental disorder and requiring commitment the care and treatment suited to the needs of the person and to ensure that the care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity;
> (2) accomplish this goal whenever possible in a community-based setting;
> (3) accomplish this goal in an institutionalized setting only when less restrictive alternatives are unavailable or inadequate and only when a person is suffering from a mental disorder and requires commitment; and
> (4) ensure that due process of law is accorded any person coming under the provisions of this part.

Mont. Code Ann. § 53-21-101.

5.    "Involuntarily committed patients in state mental health hospitals have a
Fourteenth Amendment due process right to be provided safe conditions by the
hospital administrators." *Ammons v. Wash. Dep't. of Soc. & Health Servs.*, 648
F.3d 1020, 1027 (9th Cir. 2011).

6.    Unlike the deliberate indifference standard in Eighth Amendment cruel and
unusual punishment cases, "[p]ersons who have been involuntarily committed are
entitled to more considerate treatment and conditions of confinement than
criminals whose conditions of confinement are designed to punish." *Youngberg v.
Romeo*, 457 U.S. 307, 321-322 (1982) (emphasis added). "If it is cruel and unusual
punishment to hold convicted criminals in unsafe conditions, it must be
unconstitutional to confine the involuntarily committed — who may not be
punished at all — in unsafe conditions." *Ammons*, 648 F.3d at 1027 (citations
omitted). "The combination of a patient's involuntary commitment and his total
dependence on his custodians obliges the government to take thought and make
reasonable provision for the patient's welfare." *County of Sacramento v. Lewis*, 523
U.S. 833, 852 n.12 (1998).

7.    "Government officials enjoy qualified immunity from civil damages unless
their conduct violates 'clearly established statutory or constitutional rights of
which a reasonable person would have known.'" *Mitchell v. Washington*, 818 F.3d

436, 443 (9th Cir. 2016) (citations omitted). Claims against government officials are not barred in their *personal* capacities. *E.g., Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992) (per curiam). Moreover, when a plaintiff sues a defendant for damages, there is a presumption that he is seeking damages against the defendant in his personal capacity. *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999).

8.     Plaintiffs here assert violations of the clearly established right to constitutionally adequate medical and mental care and safety under the Fourteenth Amendment, the deprivation of which has caused damages to Plaintiffs.

9.     The named individual Defendants here knew, or should have known, that their failure to institute appropriate policies and procedures to prevent injuries such as those complained of herein violate Plaintiffs' rights under the Fourteenth Amendment.

10.     The United States Constitution requires that hospital officials, in order to protect a patient's right to safe conditions, have a duty to exercise professional judgment. *E.g., Youngberg*, 457 U.S. at 321-322. The Ninth Circuit has equated the objective *Youngberg* standard to that required in "ordinary tort cases for a finding of *conscious indifference* amounting to gross negligence.'" *Neely*, 50 F.3d at 1507 (quoting *O'Connor*, 846 F.2d at 1208) (emphasis added).

11.     Plaintiffs here have a constitutional right to be safe in MSH, and "in the face of known threats to patient safety, state officials may not act (or fail to act) with

conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring." *See Ammons*, 648 F.3d at 1029-1030.

12.     Thus, it is clear that a person committed to a state institution for the mentally incapacitated has substantive rights under the Due Process Clause of the Fourteenth Amendment, the violation of which are actionable under 42 U.S.C. § 1983. When the state by the affirmative exercise of its power so restrains an individual's liberty that it renders the person unable to care for him/herself, and at the same time fails to provide for his/her basic human needs, it transgresses the substantive limits on state action set by the Due Process Clause.

13.     Article II, § 4 of the Montana Constitution provides "[t]he dignity of the human being is inviolable."

14.     Montana statutory law further dictates that Plaintiffs be free from "abuse" and "neglect." These terms are defined by the Montana legislature:

> (1) "Abuse" means any willful, negligent, or reckless mental, physical, sexual, or verbal mistreatment or maltreatment or misappropriation of personal property of any person receiving treatment in a mental health facility that insults the psychosocial, physical, or sexual integrity of any person receiving treatment in a mental health facility.
> …
> (12)(a) "Neglect" means failure to provide for the biological and psychosocial needs of any person receiving treatment in a mental health facility, failure to report abuse, or failure to exercise supervisory

responsibilities to protect patients from abuse and neglect.

> (b) The term includes but is not limited to:
> (i) deprivation of food, shelter, appropriate clothing, nursing care, or other services;
> (ii) failure to follow a prescribed plan of care and treatment; or
> (iii) failure to respond to a person in an emergency situation by indifference, carelessness, or intention.

Mont. Code Ann. § 53-21-102. Any form of abuse or neglect of a person admitted to a mental health facility is prohibited. Mont. Code. Ann. § 53-21-107. These rights are further enumerated:

> (1) Patients have a right to privacy and dignity.
>    …
> (10) Patients have the right to be provided, with adequate supervision, suitable opportunities for interaction with members of the opposite sex except to the extent that a professional person in charge of the patient's treatment plan writes an order stating that the interaction is inappropriate to the treatment regimen.
> (11) Patients have a right to receive prompt and adequate medical treatment for any physical ailments. In providing medical care, the mental health facility shall take advantage of whatever community-based facilities are appropriate and available and shall coordinate the patient's treatment for mental illness with the patient's medical treatment.
> …
> (13) Patients have a right to a humane psychological and physical environment within the mental health facilities. These facilities must be designed to afford patients with comfort and safety, promote dignity, and ensure privacy. The facilities must be designed to make a positive contribution to the efficient attainment of the treatment goals set for the patient. In order to ensure the accomplishment of this goal:

> (a) regular housekeeping and maintenance procedures
> that will ensure that the facility is maintained in a safe,
> clean, and attractive condition must be developed and
> implemented;
> (b) there must be special provision made for geriatric and
> other nonambulatory patients to ensure their safety and
> comfort, including special fittings on toilets and
> wheelchairs. Appropriate provision must be made to
> permit nonambulatory patients to communicate their
> needs to the facility staff.
> (c) pursuant to an established routine maintenance and
> repair program, the physical plant of each facility must
> be kept in a continuous state of good repair and operation
> in accordance with the needs of the health, comfort,
> safety, and well-being of the patients;
> (d) each facility must meet all fire and safety standards
> established by the state and locality. In addition, any
> hospital must meet the provisions of the life safety code
> of the national fire protection association that are
> applicable to hospitals. A hospital must meet all
> standards established by the state for general hospitals to
> the extent that they are relevant to psychiatric facilities.

Mont. Code Ann. § 53-21-142. Medication may not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with the patient's treatment program. Mont. Code Ann. § 53-21-145. Patients are entitled to individualized treatment plans. Mont. Code Ann. § 53-21-162. Patients have the right to complete patient records. Mont. Code Ann. § 53-21-165. Title 53, Chapter 21 designates and defines other rights of the severely mentally ill.

15.     Accordingly, each of the named Plaintiffs have the right to adequate staffing, as well as adequate staff training and development; the right to safety; the right to

be free of abuse and neglect; and the right to adequate mental and medical treatment.

16.     There can be no credible argument that Defendants are unaware of the threats to patient safety at MSH.

17.     For instance, MSH violations were documented by federal inspectors before losing federal accreditation. On September 30, 2021, the Centers for Medicare & Medicaid Services conducted an unannounced complaint survey at MSH and found deficiencies (some specific to Lucio DiMauro), including the following:

> a.     Patients Rights: Informed Consent, 42 CFR 482.13(b)(2). This standard was not met as evidenced by: Based on interview and record review, the facility failed to ensure that the patient's representative were fully informed of treatment changes related to multiple falls.
>
> b.     Staffing and Delivery of Care 42 CFR 482.23(b). This STANDARD is not met as evidenced by: Based on interview and record review, the facility failed to ensure adequate numbers of nursing staff were available on the Spratt unit to provide care, supervision, and one to one supervision for patients resulting in multiple falls and falls with injury, and failing to meet the needs for 3 patients out of 9 sampled patients; and failed to provided adequate nursing staff for B-Unit and E-Unit, affecting all patient care on those units.
>
> c.     Nursing Care Plan, 42 CFR 482.23(b)(4). This STANDARD is not met as evidenced by: Based on record review and staff and family interviews, the facility failed to revise care plans for 1 of 2 patients reviewed.

18. Montana lawmakers have been publicly quoted on the conditions at MSH. For example, Rep. Danny Tenenbaum (D-Missoula), released a statement providing as follows:

> I visited the State Hospital's Spratt Unit intending to see firsthand how we can improve patient care. I left in shock. Four patients to a room. No electronic medical records. Chronically understaffed. Chronic lack of training. Staff members pulling me aside in the hallways begging for change. No occupational therapy. No physical therapy. No speech therapy. Just psychotropic medication, TV, and sleep. The building is decrepit. Obvious ADA violations literally everywhere. Nonfunctioning security system—doors flying open in the wind. Renovating it would be pointless...This is how we treat Montanans living with dementia? With an 800 million dollar budget surplus? I am disgusted.

*See* https://tinyurl.com/bdhzj3dd.

19. MSH lost its federal accreditation in 2022 after investigations into patient falls, deaths and widespread safety issues.

20. An April 2023 inspection of the facility by DPHHS confirmed the continued issues with the decrepit and unsafe facility, which is especially concerning for things like illness and infection prevention with an at-risk group such as Plaintiffs:

The surveyors on-site inspection of the forensic mental health facility on 04/11/2023 and mental health group homes on 04/20/2023.

FINDINGS:

The Forensic Mental Health Facility:
(1)Pod A :
- Several of the fresh air intake vents in client bedrooms had a heavy buildup of dust and debris.
- The paint was chipped and peeling on the floors and walls in the upstairs west shower.
- The ADA bathroom had chipped concrete flooring by the door threshold and there was a buildup of a black spotted substance on the ceiling.
- The laminate on the reception desk had several areas that were cracked, peeling, and partially detached.

(2) Pod B:
- The medication room refrigerator had a buildup of dried sticky substances.

- Client bedroom B1 had a pungent urine odor, a buildup of a dried yellow substance by the sink area, and a buildup of dust, hair, and debris throughout the floor.
- Client bedrooms B3, B8, B21, B15, B14 and B13 had a build up of dust, hair, and debris throughout the flooring.
- The ADA shower had a buildup of a black spotted substance on the ceiling.
- The shower rooms had several areas that the enamel waterproof coating was worn through to the bare concrete.
- The laminate on the reception desk had several areas that were cracked, peeling, and partially detached.

(3)Pod  C:
- The sink areas in client bedrooms C#2 and C#3 had a buildup of grime, spills, and mineral deposits.
- The medication room freezer had a 3-inch buildup of frost.
- Several of the ceiling tiles in the med room were damaged.
- The ceiling fresh air exchange vent had a buildup of dust and debris.
- The shower room had chipped and peeling paint and a buildup of a black spotted substance on the ceiling.

(4) Pod D:
- The walls in client bedrooms D1, D5 and D6 had a buildup of grime and crayon.
- The sink areas client bedrooms D7 and D8 had a buildup of grime and mineral deposits.
- The shower room had chipped and peeling paint.

Mental Health Group Homes
(5) MT Haggin Group Home:
- Client bathroom #2 had a pungent urine odor, the wall behind the toilet, the wall by the shower, and the flooring by the shower had areas of water damage.

(6) McCollum Group Home:
- The window glass in client bedroom #1 by the closet was cracked.

(7) Pintlar Group Home:
- The paint above the showers in the men's restroom was cracked and peeling.
- The air exchange vent on the men's restroom door was blocked by a buildup of dust and debris.
- Several of the florescent light covers were missing in the client bedrooms and hallways.
- Client bedroom #33 had a pungent urine odor.

https://mt-

reports.com/portal/FacilityDetails.aspx?name=&address=&city=warm+springs&zi

p=&licensetypeid=-1

21.     Other violations were found during a 12/15/21 DPHHS survey:

> 37.106.1618-6 STAFFING REQUIREMENTS
>
> The surveys review of policy MSH FMHF-03, staffing schedules of
> shift actually worked from 09/19/2021- 12/11/2021 and interviews with
> 22 staff, and 4 of clients on 12/09/2021 – 12/14/2021.
> FINDINGS: (1) The facility did not have adequate staff to provide all
> essential security, operational and treatment functions as required in
> policy MSH FMHF- 03.
> …
> Staff interviewed reported they felt the facility was not staffed to acuity
> on a regular basis. They stated that groups are often cancelled, and
> clients are only receiving the bare minimum in services such as food,
> medication management, and exercise. Exercise is only provided when
> staff allows for the clients to leave the pods to attend groups. The
> facility was not able to provide the supervision and care required by the
> clients treatment plans due to emergent staffing levels. Clients
> interviewed stated the treatment groups such as recreation get cancelled
> because there is not enough staff to facilitate them.
> …
>
> PLAN OF CORRECTION: 37.106.1618-6. (1). MSH facility and unit
> management shall conduct daily staffing assessments to ensure
> sufficient staff for security, care services, and client activity programs,
> as occurring in the MSH FMHF-03 policy. (2). Contingency plans have
> been identified regarding emergency staffing level.

22.     These same violations were found in subsequent investigations detailed in a

4/25/22 DPHHS report.

23.     Furthermore, it is widely known that the Spratt Unit at MSH, which primarily serves dementia patients, has a significantly higher ratio of beds to staff than other state hospitals providing similar services in the western region. It is widely acknowledged that the Spratt Unit has inadequate occupational and recreational therapists.

24.     In spite of these known deficiencies and unsafe conditions, MSH has failed to provide an adequate workforce, and resulting workforce shortages in turn increase stress on remaining staff, who work to meet the demand with fewer and fewer resources, causing the problem to snowball even more and resulting in the sub-standard environment for all residents.

25.     Defendants' conduct and omissions caused constitutional, statutory, and common-law deprivations of Plaintiffs' rights.

26.     Plaintiffs seek monetary damages resulting from MSH's failure to maintain an adequate oversight system to assure that medical and mental health care are administered safely and properly to MSH residents in accord with federal and state law.

27.     Plaintiffs seek injunctive relief as proposed in the Prayer for Relief.

## JURISDICTION AND VENUE

28.     This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and federal statutory law. This Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

29.     This Court has supplemental jurisdiction to consider state law claims under 28 U.S.C. § 1367.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES - PLAINTIFFS

31.     The named Plaintiffs are past and present civilly committed patients at the Montana State Hospital, who have authority to bring this action through their respective personal representatives and guardian/conservator. Each Plaintiff is identified in more detail below.

### Lucio DiMauro

32.     Lucio DiMauro ("Lucio") was a resident of MSH until his death on August 18, 2021, while residing in the SPRATT unit.

33.     Lucio suffered a traumatic brain injury in 2012 that significantly impacted his cognitive abilities. After years of living independently with the assistance of his sister, Nina DiMauro ("Nina"), Lucio was transferred to MSH for a second time in September of 2020 after civil commitment proceedings in Yellowstone County.

34.     At the time of his admission in September of 2020, Lucio was able to walk using a walker, was able to talk clearly, and was not on a restricted diet. After being admitted to MSH, Lucio was regularly over-medicated by MSH staff.

35.     Over the course of his second stay at MSH, the lack of care, treatment, and documentation resulted in Lucio being subjected to an unsafe environment, part of which led to him suffering numerous falls, without any demonstrable response by MSH administration.

36.     Lucio had reported falls on May 10, 2021; May 14, 2021; two falls on May 19, 2021; June 10, 2021; June 23, 2021; and June 23, 2021.

37.     Lucio also contracted Covid-19 while at MSH.

38.     Nina visited Lucio on June 26, 2021, to find him with a butterfly bandage on his forehead without being previously told of the injury. Later that same day, MSH staff documented another fall.

39.     In spite of the numerous falls and unsafe conditions, MSH failed to notify Nina of any changes to Lucio's treatment plans after his falls.

40.     On June 28, 2021, Nina was finally called about Lucio's June 26, 2021, fall and the resulting laceration over Lucio's eyebrow. MSH records indicate that the new treatment plan to prevent falls would be to leave a wheelchair at the front of the room or outside the room "to discourage [patient] from attempting to self-transfer."

41.     On July 30, 2021, and August 4, 2021, Lucio had more falls, all while under physician's orders for 15-minute checks when in his room.

42.     Lucio was treated at Anaconda Hospital on August 5, 2021, and was
diagnosed with stage IV colon cancer. Nina was told by Lucio's treating providers
that Lucio would have 3 to 6 months to live.

43.     MSH immediately started administering Morphine and Ativan to Lucio
every three hours up to the date of his death. MSH staff contacted Nina on August
6, 2021, and told Nina to change Lucio's Do Not Resuscitate status because of the
cancer diagnosis.

44.     Lucio had more falls on August 11, 2021, and August 12, 2021, with the last
fall causing a large laceration on the left side of his forehead.

45.     Again, MSH staff failed to notify Nina of the falls.

46.     On August 13, 2021, Lucio again fell out of bed and reopened his forehead
laceration. No apparent attempts were made by MSH to close the forehead wound.

47.     Even though Nina was supposed to be involved in Lucio's psychological and
medical care, MSH did nothing to include Nina.

48.     When Nina visited Lucio on August 15, 2021, Lucio was unable to
communicate and unable to open his eyes for more than seconds at a time. Nina
was shocked by his condition, with a swollen forehead and open wound on his
forehead. The forehead gash had not been reported to Nina prior to her visit.

49.    Nina saw her brother for the final time on August 17, 2021. Nina spoke to

Dr. Edward Tu on August 17, 2021, and even he referenced the lack of

documentation as to Lucio's falls.

50.    Nina requested that Lucio be given his Last Rites due to their Catholic faith,

but not even this happened.

51.    Lucio died the next day on August 18, 2021.

52.    On September 30, 2021, the Centers for Medicare & Medicaid Services

conducted an unannounced complaint survey at MSH and found standard

deficiencies, some specific to Lucio, including the following:

   a.    Patients Rights: Informed Consent, 42 CFR § 482.13(b)(2).This
   standard was not met as evidenced by: Based on interview and record
   review, the facility failed to ensure that the patient's representative were
   fully informed of treatment changes related to multiple falls.
   b.    Patient Rights: Free From Abuse/Harassment, 42 C.F.R. §
   482.13(c)(3): The patient has the right to be free from all forms of abuse or
   harassment. This standard is not met as evidenced by: Based on interview
   and record review, the facility failed to thoroughly investigate the
   unexpected death to show that neglect did not occur…
   c.    Staffing and Delivery of Care 42 CFR 482.23(b). This STANDARD
   is not met as evidenced by: Based on interview and record review, the
   facility failed to ensure adequate numbers of nursing staff were available on
   the Spratt unit to provide care, supervision, and one to one supervision for
   patients resulting in multiple falls and falls with injury, and failing to meet
   the needs for 3 patients out of 9 sampled patients; and failed to provided
   adequate nursing staff for B-Unit and E-Unit, affecting all patient care on
   those units.
   d.    Nursing Care Plan, 42 CFR 482.23(b)(4). This STANDARD is not
   met as evidenced by: Based on record review and staff and family
   interviews, the facility failed to revise care plans for 1 of 2 patients
   reviewed.

53. Nina DiMauro has been appointed the Personal Representative of Lucio DiMauro's Estate.

**<u>Lesley Jungers</u>**

54. Mrs. Jungers was transferred from a mental health facility in Kalispell on August 14, 2020, after a long history of Bipolar I Disorder.

55. Lawrence Jochim has authority to act on his daughter's behalf as he has been appointed as a co-guardian and co-conservator for his daughter. Karla Langlois has authority to act on her sister's behalf as she has been appointed as a co-guardian and co-conservator for Mrs. Jungers.

56. Nonetheless, after her admission, Mrs. Junger's family was notified less than 2 months later of an incident in which she was allowed to elope from her room and engage in inappropriate sexual contact with a male resident around October 8, 2020. This was allowed to happen in spite of MSH policies and procedures. Even though Mrs. Jungers was deemed to have a mental illness making her unable to provide for herself, MSH administration blamed Mrs. Jungers for the elopement.

57. Moreover, Mrs. Jungers was later moved from the A-Unit to the gym due to a Covid outbreak on October 9, 2020. At the time, Mrs. Jungers was on 1-to-1 staffing and her attending physician likely objected to the move, telling administration that it was inappropriate to place Mrs. Jungers in this environment due to her mental illness. The physician's plans were not followed, and she was

moved to the gym. Mrs. Jungers then attempted to escape, was stopped by security, and then returned to Locked Seclusion on Unit A.

58.    MSH then placed Mrs. Jungers in Locked seclusion for 14 days. Her family made numerous calls to administration objecting to the locked seclusion, but messages were never returned.

59.    Mrs. Jungers remained in locked seclusion for approximately 10 days. Mrs. Jungers' family, who was obviously concerned, tried to contact Mrs. Jungers by phone, and during one attempt, a MSH employee was overhead to say that Mrs. Jungers was "a pain in the ass." Her family reported this, along with other complaints, to MSH administration.

60.    On October 28, 2020, MSH reported to Mrs. Jungers' family that she had again been allowed to elope from her room and was found naked in the observation/seclusion area with another resident. Mrs. Jungers was still ordered for 1-to-1 staffing at that time. The family was told that an investigation would ensue. Video evidence of the contact was obtained. Mrs. Junger's family were later told that the video evidence had "been taken care of," or words to that effect. The family interpreted the statement to mean that it had been destroyed.

61.    MSH again allowed Mrs. Jungers to elope from her room on or about November 28, 2020, but provided no other specifics.

62.     Mrs. Jungers is still a patient at MSH, and has been diagnosed with frontal lobe dementia.

63.     The actions and omissions of Defendants have caused injury to Mrs. Jungers and her family, who have been devastated by the lack of safety at MSH, the failure to follow policies and procedures, and for the neglect of administration to remedy or prevent the repeated violations complained of herein.

## David Patzoldt

64.     David J. Patzoldt was admitted to MSH on October 19, 2021, on a court ordered detention from Missoula County. A 75-year old retired male, he had been residing at a Missoula memory care unit for the prior three months and had a series of behavioral disruptions. He had prior diagnoses of Alzheimer's dementia, possible cluster B personality traits, history of alcohol abuse, chronic congestive heart failure, chronic atrial fibrillation, hypertension, constipation, diabetes, and chronic kidney disease.

65.     As part of his transfers between different assisted living facilities for behavioral disturbances, Mr. Patzoldt was seen at Providence St. Patrick Hospital on October 1, 2021, where a Physical Therapy Plan of Care Initial Evaluation was completed. Records indicate that Mr. Patzoldt was able to go from supine to sitting transfer with bed rails and no assist; no lightheadedness/dizziness with sitting or

standing; completed gait training over 330 feet, with short therapeutic standing rest breaks; no pain in the BLEs with gait activity today; no fatigue with activity.

66. Mr. Patzoldt's condition was good enough that the physical therapy recommendation was to an assisted living facility (as opposed to a skilled nursing facility).

67. Less than four months later, the majority spent at MSH, Mr. Patzoldt died on January 26, 2022, with a nonstageable pressure ulcer on his left heel, a right buttock pressure ulcer, sepsis, covid pneumonia, and cellulitis.

68. Mr. Patzoldt's congestive heart failure was exacerbated due to an "oversight" in administering Mr. Patzoldt's heart medication (i.e., Lasix) from November 4, 2021, to November 24, 2021. That is, based on MSH records, Lasix was not given from November 4, 2021, to November 24, 2021, during which time Mr. Patzoldt's condition is noted to deteriorate.

69. Mr. Patzoldt's "discharge record" from MSH noted that he was compliant with all cares and adherent to medications, and there were not changes to psychiatric medications in January up until Mr. Patzoldt had a significant change in mental status related to sepsis on January 23, 2022, at which point all oral medications were held. Mr. Patzoldt died from sepsis, Covid-19 and cellulitis on January 26, 2022.

70.     Mr. Patzoldt also had documented falls on November 5, 8, and 11, 2021.

71.     At all times during his residency at MSH, the plan was for Mr. Patzoldt to return to live with his family once appropriate housing was in place. That never occurred due to his death while in the legal custody of MSH.

72.     Upon information and belief, MSH received payments in excess of $20,000 on behalf of Mr. Patzoldt during each month of Mr. Patzoldt's residency.

73.     Christine Payton has been appointed as the Personal Representative of Mr. Patzoldt's Estate.

## John Does I-X and Jane Does I-X

74.     John Does I-X and Jane Does I-X include individuals who are similarly situated to the Plaintiffs in this action and who were subjected to the federal and state violations alleged herein. John Does I-X and Jane Does I-X further include any individuals whose claims may be working through any administrative procedures.

## THE PARTIES - DEFENDANTS

75.     Defendant Greg Gianforte is the Governor of Montana. As such, he is the chief executive officer for the State of Montana and is ultimately responsible for the operation of the MSH. He is sued in his individual and official capacity.

76.     Defendant Charlie Brereton is the current Director of DPHHS. As such, he is charged by law with the duty to supervise, direct, account for, organize, plan,

administer and execute the functions vested in DPHHS; to establish policies to be followed by DPHHS and its employees and to prescribe rules for the administration of DPHHS and the conduct of its employees. He is sued in his individual and official capacity.

77.     Defendant David Culberson is the current administrator of MSH. He is responsible for the administration and operation of MSH and for the health, safety and welfare of the persons residing there. He is sued in his individual and official capacity.

78.     John Does I-X and Jane Does I-X are persons who are liable for some of the acts, omissions, and other conduct alleged herein.

79.     The individual Defendants acting in their personal and official capacities (i.e., Gianforte, Brererton, Culberson, and Does) have direct oversight over all of MSH policies and practices.

80.     The individual Defendants have a duty to provide safe conditions for patients at MSH, to include these Plaintiffs.

81.     The individual Defendants have a duty to follow the statutes and regulations pertaining to the management and operation of MSH.

82.     The individual Defendants have personally participated in the unconstitutional and negligent treatment suffered by Plaintiffs. These Defendants have refused to take steps to ameliorate neglectful treatment made known to them

by family members of Plaintiffs, through governmental agencies, members of the public, and likely through its own employees at DPHHS and MSH.

83.     The State of Montana is a governmental entity which owns the MSH.

84.     DPHHS is an agency of the State of Montana which operates the Montana State Hospital in Warm Springs. One of DPHHS' duties is to propose programs to the legislature to meet the projected long-range needs of institutions, including programs and facilities for the diagnosis, treatment, care, and aftercare of persons placed in its institutions. Mont. Code Ann. § 53-1-603(4).

85.     The purpose of DPHHS is to develop and maintain comprehensive services and programs in the fields of mental health. Mont. Code Ann. § 53-1-601. The heads of the facilities in DPPHS are responsible for the immediate management and control of the institutions, such as MSH. *See* Mont. Code Ann. § 53-1-604.

86.     DPHHS is responsible for administering and supervising public assistance for persons with severe disabilities. This requires administering all state and federal funds allocated to DPHHS and doing all things necessary, in conformity with federal and state law, for the proper fulfillment of public assistance purposes. Mont. Code Ann. § 53-2-201(1)-(2).

87.     DPHHS "shall adopt rules to manage the state hospital patient population in a manner that will ensure emergency access to services, protect public and individual safety, provide active treatment, implement effective discharge

planning, and ensure access to appropriate community-based services." Mont.

Code Ann. 53-21-601(3).

88.     The rules pertaining to the organization of DPHHS provide that the

Governor appoints the director of DPHHS. Admin. R. Mont. 37.1.101(1)(b). The

Director of DPHHS heads the department. *Id.* There are three department branches,

one of which is Medicaid and Health Services, and this branch provides direct

supervision over the Addictive and Mental Disorders Division. *Id.* at

37.1.101(1)(c), (3)(b). The Addictive and Mental Disorders Division manages

"rehabilitation services" for people with chemical dependency and adult mental

illness at three state facilities. At one of those facilities, MSH, management

responsibilities include providing inpatient psychiatric hospital services to adults

with serious mental illness. *Id.* at 37.1.101(3)(b)(iii).

89.     Montana's statutory scheme says that the primary function of MSH is to

provide care and treatment of mentally ill persons. Mont. Code Ann. § 53-21-

601(1)-(2). The role of MSH is "to provide intensive inpatient psychiatric services,

including those services necessary for transition to community care, as components

in a comprehensive continuum of publicly and privately provided programs that

emphasize treatment in the least restrictive environment." *Id.* The mission of MSH

is "to stabilize persons with severe mental illness and to return them to the

community as soon as possible if adequate community-based support services are available." *Id.*

90.     At all times relevant hereto, each of the Defendants are acting under the color of state law and pursuant to their authority as officials and/or employees of the State of Montana and as officials and/or employees of DPHHS.

**FIRST CAUSE OF ACTION – 42 U.S.C. § 1983, VIOLATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS**
**(Asserted on behalf of all Plaintiffs and against individual Defendants acting in their personal and official capacities)**

91.     Plaintiffs reincorporate the preceding paragraphs as if set forth herein.

92.     A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect Plaintiffs from an unreasonable risk of harm once it takes that person into its custody at MSH.

93.     The foregoing policies and practices of Defendants, in their official and personal capacities, constitute a failure to meet the affirmative duty to protect Plaintiffs from an unreasonable risk of harm and reflect a deliberate indifference to the mental health and medical needs of Plaintiffs. These failures are a substantial factor leading to, and proximate cause of, the violation of Plaintiffs' constitutionally-protected liberty interests conferred upon them by the Fourteenth Amendment to the United States Constitution.

94.     Defendants are well aware of the policies and practices that constitute a failure to protect the safety of Plaintiffs while in the care of MSH, and to prevent Plaintiffs from being subjected to an unreasonable risk of harm.

95.     The foregoing actions and inactions of Defendants, in their official and personal capacities, constitute policies, patterns, practices and/or customs that are contrary to law and are substantial departures from any accepted professional judgment such that are contrary to law and are substantial departures from any accepted professional judgment such that they are outside of that judgment. Defendants' actions and inactions are also in deliberate indifference to their awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists for Plaintiffs and they have drawn that inference. As a result of Defendants' actions and inaction, Plaintiffs have been harmed or at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

96.     These substantive due process rights include, but are not limited to: the right to protection from harm and unreasonable risk of harm while in state custody at MSH; the right to necessary treatment, care, and services to prevent Plaintiffs from deteriorating or being harmed physically, psychologically, or otherwise while in

state care at MSH; and the right to adequate supervision and monitoring of their health and safety.

97.     Defendants' acts or omissions were done maliciously or with conscious and reckless disregard for Plaintiffs' constitutional rights.

98.     As a direct and proximate result of Defendants' acts and omissions described above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

99.     Plaintiffs are entitled to recovery of an award of punitive damages allowable under 42 U.S.C. § 1983 and Mont. Code Ann. § 27-1-221.

100.    Plaintiffs are entitled to an award of attorney's fees and costs under 42 U.S.C. § 1988 and Montana law.

## SECOND CAUSE OF ACTION – 42 U.S.C. § 1983, *Monell* Liability
**(Asserted on behalf of all Plaintiffs against Defendants State of Montana and DPHHS)**

101.    Plaintiffs reincorporate the preceding paragraphs as if set forth herein.

102.    Governmental liability can attach under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for even a single decision made a final policymaker in certain circumstances, regardless of whether or not the action is taken once or repeatedly. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). If an authorized policymaker approves a subordinate's decision and the basis for it, such

ratification could be chargeable to the municipality under *Monell*. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

103.    The acts and omissions described above were done pursuant to customs, policies, practices, or procedures of the State of Montana and DPHHS which were directed, encouraged, allowed or ratified by the State of Montana and DPHHS that failed to provide for the adequate care and safety of Plaintiffs.

104.    The State of Montana and DPHHS failed to properly staff, train, instruct, monitor, supervise, and evaluate its employees, and in so failing, acted with conscious disregard to Plaintiffs' constitutional rights.

105.    The State of Montana and DPHHS has approved, tolerated, and ratified the unconstitutional conduct of its employees by acting with conscious disregard to the mental health needs of Plaintiffs.

106.    The conduct alleged herein is not a single, isolated incident, but rather is part of a larger pattern of improper conduct at MSH arising from improper staffing, training, and supervision of its employees as evidenced by the rampant indifference to the mental health needs of Plaintiffs and those confined to MSH, and this conduct is attributable to and chargeable to the State of Montana and DPHHS under *Monell*.

107. The conduct described herein was the proximate cause of, and the moving force behind, the deprivation of Plaintiffs' constitutional rights in accordance with the *Monell* doctrine.

108. The allegations set forth herein were done maliciously and with conscious disregard for the safety and rights of Plaintiffs, and they amount to deliberate indifference to Plaintiffs' constitutional rights.

109. Plaintiffs are entitled to compensatory and punitive damages, and all damages allowed under law, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION – VIOLATION OF THE RIGHT TO DIGNITY (ART. II, § 4 OF THE MONTANA CONSTITUION)
**(Asserted on behalf of all Plaintiffs against all Defendants)**

110. Plaintiffs reincorporate the preceding paragraphs as if set forth herein.

111. Article II, § 4 of the Montana Constitution makes it fundamental that "the dignity of the human being is inviolable."

112. Defendants' treatment of Plaintiffs degraded and demeaned them as persons, failed to acknowledge their worth as human beings, and directly violated their constitutional right to dignity.

113. As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights to dignity, Plaintiffs suffered physical and emotional injuries, all of which deteriorated their well-being, causing pain, suffering; and hastened the death of Plaintiff DiMauro and caused the death of Plaintiff Patzoldt.

## FOURTH CAUSE OF ACTION – NEGLIGENCE
### (Asserted on behalf of all Plaintiffs against Defendants State of Montana and DPHHS)

114.  Plaintiffs reincorporate the preceding paragraphs as if set forth herein.

115.  At all times relevant to this Complaint, the State of Montana and DPHHS owed duties of care to Plaintiffs to reasonably and prudently provide services, supervision and care.

116.  The State of Montana and DPHHS breached its duties to reasonably and prudently provide services, supervision and care, as alleged herein, throughout the time they cared for Plaintiffs.

117.  The breaches of the State of Montana and DPHHS caused Plaintiffs to suffer serious and painful physical injuries and severe emotional distress; and hastened the death of Plaintiff DiMauro and caused the death of Plaintiff Patzoldt.

118.  The State of Montana and DPHHS are therefore liable for all damages allowed under law.

## FIFTH CAUSE OF ACTION – NEGLIGENCE *PER SE*
### (Asserted on behalf of all Plaintiffs and against Defendants State of Montana and DPHHS)

119.  Plaintiffs reincorporate the preceding paragraphs as if set forth herein.

120.  The State of Montana and DPHHS owed duties set by Montana law found at Mont. Code Ann. § 53-21-101 *et seq*.

121.   The State of Montana and DPHHS breached their statutory and regulatory duties to Plaintiffs by failing to prevent abuse and neglect, failing to adequately document and report the abuse and neglect, and failing to adequately investigate and respond to the abuse and neglect.

122.   The State of Montana and DPHHS breached their statutory duties to provide Plaintiffs with their right of dignity.

123.   The State of Montana and DPHHS breached their statutory duties to provide Plaintiffs with their right to receive prompt and adequate medical treatment for any physical ailment.

124.   The State of Montana and DPHHS breached their statutory duties to provide Plaintiffs with a right to a humane psychological and physical environment within MSH.

125.   The State of Montana and DPHHS breached their statutory duties to prevent the unnecessary and excessive medication of Plaintiffs.

126.   The State of Montana and DPHHS breached their statutory duties to provide Plaintiffs with an adequate treatment plan, and with reporting noncompliance with the treatment plan.

127.   The State of Montana and DPHHS breached their statutory duties to maintain complete and adequate patient records for Plaintiffs.

128. The breaches of the State of Montana and DPHHS caused physical and emotional injury to Plaintiffs; and hastened the death of Plaintiff DiMauro and caused the death of Plaintiff Patzoldt. Plaintiffs are therefore entitled to all damages allowed under law for these acts and omissions.

129. Plaintiffs fall within the class of persons the statute was intended to protect; the harm complained of was the same harm the statute was intended to guard against; and the violation of the statute caused injury to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

### Injunctive Relief

1. Compel Defendants to provide a safe environment for its residents where they will be free from abuse and neglect;

2. Compel Defendants to maintain a sufficient staff-patient ratio, including sufficient numbers of professional staff to provide adequate psychiatric, psychological, and medical treatment, and to provide for other necessities of life for residents;

3. Award Plaintiffs their costs and attorney's fees in accordance with 42 U.S.C. § 1988; and

4. Award such other relief as the Court deems appropriate and just.

## Damages

5.     Plaintiffs request actual and compensatory damages as are deemed fair and just under 42 U.S.C. § 1983 for each Plaintiff.

6.     Plaintiffs request punitive damages under 42 U.S.C. § 1983 due to the reckless or callous indifference to the constitutional rights of Plaintiffs to the fullest extent permitted by law.

7.     Plaintiffs request pre-judgment and post-judgment interest.

8.     Plaintiffs further request all damages to which Plaintiffs are entitled to under federal and state law in such categories and in such amounts as will be furnished to Defendants in accordance with applicable federal and state law and/or the Federal Rules of Civil Procedure, or by amendment, or proof at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all causes of action so triable.

Dated this 31st day of October, 2023.

**HEENAN & COOK**

*/s/ John Heenan*
John Heenan

*/s/ Philip McGrady*
Philip McGrady

*Attorneys for Plaintiffs*